GEORGE WALLACE WHITE

*v.*

ANNA MAE WHITE.

[Submitted May 1st, 1902.  Decided September 20th, 1902.
Filed January 26th, 1903.]

1. Evidence in an action for divorce examined, and *held* sufficient to show that both parties were guilty of adultery, and that neither was entitled to relief.

2. *Derby* v. *Derby, 6 C. E. Gr. 36,* at *pp. 39* and *40,* cited and commented upon.

---

Petition for divorce.  On final hearing on pleadings and proofs in open court.

*Mr. Robert S. Hudspeth,* for the petitioner.

*Mr. Zebulon M. Ward,* for the defendant.

White *v.* White.

Pitney, V. C.

The petitioner, George Wallace White, by his petition, charges his wife, Annie Mae White, the defendant, with adultery with one Edward Zinke, and prays for a divorce by reason thereof.

The defendant, by her answer, denies the adultery, and by way of defence and in a cross-petition charges her husband with adultery with a Mrs. Julia Eaton, and prays for a divorce on her part from her husband.

By two several amendments which she was allowed to make, the defendant further charges her husband with adultery with an unknown woman at a roadside tavern, and also with adultery with a certain Mrs. B., at a time and place named.

The petitioner, by replication, denies each of these charges.

Evidence was adduced on seven non-consecutive days between the 25th of June, 1901, and the 21st of April, 1902, inclusive.

The evidence is voluminous and contradictory to a painful extent, showing clearly an unusual amount of perjury on one side or the other, and almost certainly on both.

The evidence adduced on each side in support of the charges made is ample to support them, if believed, and the denials and contradictions on each side are ample, if believed, to refute the charges.

I might content myself with stating the effect upon my mind, first, of listening to the evidence with care; second, of elaborate and able arguments on each side, and third, of a careful perusal of the evidence as transcribed. But the standing of the parties in the community and the importance to each of the result to which I feel myself constrained to come, and the very able manner in which the questions have been discussed by counsel, induce me to give my reasons at length.

The petitioner is, I believe, the only child of his parents, who seem to have lived for the greater part of their lifetime in the city of Paterson, and the father seems to have acquired considerable wealth. The petitioner is a well educated man, a practicing physician, and it is said has a large practice.

The defendant's maiden name was Wheatley. She is a native of New York, a daughter of a scenic artist, who died during her infancy and left her to the care of her mother, who has resided

for many years in Paterson, where the defendant seems to have been reared.

The parties were secretly married while living at Paterson, on the 17th of October, 1891.

Some time thereafter, the petitioner, who was desirous of establishing himself in the practice of medicine, moved with his parents to West Hoboken, and took his wife with him. His father became the owner of a dwelling on the corner of Palisade avenue and ———— street, the front of the first floor of which was used as a drug store. The petitioner opened his suite of offices on the same floor in the rear of the drug store, with a door opening on the side street.

The father and mother occupied the first floor above for their residence, and the petitioner and his wife occupied the second floor above for theirs.

One child—a son—was born to them in the year 1896.

This mode of living continued until the parties separated, in January, 1901.

The suit was commenced on the 30th of November, 1900, and the parties had occupied separate apartments for some time previous to that date, and in January, 1901, the wife withdrew herself to her mother's house at Paterson, where she has continued to reside ever since.

The parties are both young, of a suitable comparative age, both possessing attractive personalities, and if both had been faithful to their marriage vows should have led a model married life.

Taking up now the case made by the petitioner against his wife.

[Omitting discussion of evidence.]

In estimating the value of this and all the evidence, standing by itself and disconnected from the denials and explanations which I will notice further on, it is proper to say that circumstances arose in the course of the production of the evidence in this cause which constrains me to look upon all of that produced against the defendant with much distrust and subject it to severe criticism. Those circumstances are the following: On the 13th of January, 1902, in the course of the examination of a

White *v.* White.

witness produced by the defendant, it appeared that the peti-
tioner had used money to hire a person in attendance before the
court, whose evidence it was supposed would tend to prove the
charges against the petitioner, to absent himself from the court,
or, if he was called to the stand, to know nothing. This matter
coming to the attention of the court I immediately instituted pro-
ceedings to investigate it, and called upon the petitioner to show
cause at a future day why he should not be adjudged guilty of
contempt of the court. The proceedings so instituted resulted in
the taking of considerable evidence, which satisfied me that both
the petitioner and his alleged paramour, Mrs. Eaton, had been
guilty of tampering with the witness in the manner stated, and
also that two or three employes of the petitioner had likewise
been guilty, with the result that they were all adjudged guilty
and all the parties fined, the petitioner and one of his employes
in a large sum. It further appeared in the progress of the cause
that the petitioner was possessed of pecuniary means which en-
abled him to expend money freely in procuring evidence both
to sustain his own view of the case and to combat that of the
other side. I was entirely satisfied in that proceeding for con-
tempt that both the petitioner and Mrs. Eaton had deliberately
falsified.

On the other hand, while the defendant has enjoyed but a
comparatively small alimony, *pendente lite,* and her counsel has
received a very moderate counsel fee, and she, so far as appears,
is not possessed of any pecuniary means, yet she seems to have
friends, and to have been able to procure evidence and witnesses
to support her view of the case; and two apparently respectable
females, who were called by her to assist in proving an *alibi* on
one of the days on which the evidence tended to show that she
had been guilty of adultery with Zinke, were shown to have
falsified, and after the evidence showing the falsity of their testi-
mony had been taken, they felt constrained to admit that they
had been mistaken. I am, however, unable to see how they could
have been mistaken.

I mention this now to show that the evidence on both sides
must be scanned with great care, but I feel constrained to say
that that produced on the part of the petitioner deserves the more
severe scrutiny.

Now coming to the denials and explanations of the defendant.

[Omitting discussion of evidence.]

Taking all the evidence together, I am entirely satisfied that the case against the defendant is made out.

Now, as to the case made by the evidence against the petitioner. Sexual intercourse is alleged with three persons—one, a Mrs. B., supported by one witness. It is enough to say of this charge that it fails signally, but I am not prepared to say that it was not made in good faith.

The next charge of adultery is with an unknown woman at a roadside tavern in Hoboken or its neighborhood.

[Omitting discussion of evidence.]

With regard to this charge I will content myself at present by saying that I see no reason to seriously doubt the evidence of Mr. Beekman, upon which it mainly rests.

I come now to the third charge, which is the one particularly relied upon by the defendant, and that is the charge of adultery with Mrs. Julia Eaton.

[Omitting discussion of evidence.]

Now, taking the evidence together, I am forced to the conclusion that the case is made out against the petitioner, and this in full view of the fact that the defendant, helpless woman as she is, has been able to induce witnesses to prevaricate upon the stand. But the witnesses whose evidence tends to prove the case against the petitioner are numerous; many of them are disconnected with each other, so that it is impossible to believe there was a concert between all of them; most of them were not subject to any particular influence that might be brought to bear upon them by the defendant. Hence, I am unable to believe that it was possible for her to induce so many witnesses, having such variant attitudes towards her and the case, to come on the stand and deliberately perjure themselves. Or, to state it in another way, if the case rested on the evidence of one, or two, or three witnesses, and their evidence was not supported by other evidence, and was not consonant with the general trend of the whole evidence, I might believe that they were either mistaken or perjured; but where so many witnesses differently situate, with di-

verse interests and connections, swear to so many facts all looking in one direction, I find it impossible to escape the result.

The result is that I find both parties guilty, and can afford neither any relief.

I come to this conclusion, so far as relates to the defendant, with regret. I should have been glad to acquit her and give her relief against her husband. I say this because there is good reason to suspect, if not believe, that the petitioner persistenly defrauded the defendant by withholding from her and bestowing upon other women those ministrations of love which every husband owes wholly to his wife, and, if so, it was natural, though unlawful, for the defrauded wife to cast her affections upon this innocent boy, and seduce him, as I believe she did, to perform her husband's duties. Such a case naturally excites the sympathies of a judge toward the unfortunate female; and the books furnish instances where judges have permitted their sympathies to lead them from the plain path of judicial duty so far as to deliberately smother their real convictions and delude themselves into a sort of belief that the evidence is insufficient to show the guilt of the wife. I am glad to say that few persons of intelligence and sound judgment approve this mode of administering justice, and I believe that most persons condemn it. The striking picture, so graphically drawn by the masterly hand of Chancellor Zabriskie in *Derby* v. *Derby, 6 C. E. Gr. 39, 40,* of a delinquent husband taking "feeble hold" with "weakened, blanched and attenuated hands upon the horns of the altar of justice," seems to me to be a distracting and dangerous object to have lodgment in the mind of the earnest, diligent and honest seeker for the truth, tending, as I think it does, to produce dimness and obliquity of vision and erroneous results. Better far, in my judgment, to keep at all times in view the time-honored motto: "Let the truth prevail though the heavens fall." Conscious as I am that my judgment is convinced by the evidence in the cause that this defendant is guilty, my oath of office compels me so to declare, and let the law of the land fix the consequences.

The only question that remains is to determine what shall be done with the child, and what provision shall be made for his care and maintenance. Upon that I will hear counsel.